AUSA: R. Michael Bullotta     Telephone: 313-226-9507
Special Agent: David S. Kotal (FBI)     Telephone: 248-828-7564

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America,

      Plaintiff,

v.

D-1 ANGELA KAMPOSH and
D-2 FAYE KAMPOSH,

Case: 2:13-mj-30688
Judge: Unassigned,
Filed: 10-25-2013 At 10:44 AM
RE: ANGELA KAMPOSH AND FAYE KAMPOSH
(eob)

      Defendant(s).

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of __July 10, 2013 through October 24, 2013__, in the county of __Oakland__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 666(a)(2) | Bribery |
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute controlled substances |

FILED
OCT 25 2013
CLERK'S OFFICE
DETROIT

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT

☐ Continued on the attached sheet.

*Complainant's signature*

David S. Kotal, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: October 25, 2013

*Judge's signature*

City and state: Detroit, Michigan

Honorable R. Steven Whalen, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# A CRIMINAL COMPLAINT

I, David S. Kotal, being first duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a criminal complaint charging ANGELA KAMPOSH ("ANGELA") and FAYE KAMPOSH ("FAYE") with bribery, in violation of 18 U.S.C. § 666(a)(2), and charging ANGELA KAMPOSH additionally with possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1).

2. I have been employed as a Special Agent with the FBI for approximately the last 16 years. During my career, I have investigated numerous violations of federal law including public corruption, white collar crime and narcotics cases. I am currently assigned to the Oakland County Resident Agency and have been working with the Berkley Public Safety Department on this investigation.

3. The facts in this affidavit come from my personal observations, my training and experience in the area of narcotics investigation and prosecution, and information obtained from other agents/officers and witnesses, including verification of my opinions. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

1

## **PROBABLE CAUSE**

4.  In May, 2013, the FBI and Berkley Public Safety Department ("BPS") opened an investigation based on a Cooperating Witness's ("CW1") statements that Louie Kamposh ("Louie"), a prisoner at the Macomb Correctional Facility, and ANGELA KAMPOSH wanted to kill Robert North, the Deputy Chief of BPS ("North"), because of North's opposition to the Kamposh's obtaining a liquor license in Berkley, Michigan. North agreed to assist the investigation and agreed to pose as a corrupt police officer to obtain evidence in this matter.

5.  Subsequent information provided by CW1 showed that Louie and ANGELA had revised their plans for North. Instead of killing North, they decided to attempt to bribe him to obtain his cooperation in getting a liquor license in Berkley for their new liquor store.

6.  On 06/19/13, during a consensual recorded conversation, CW1 told Louie his people had contacted North and that if they wanted to bribe him for his assistance with obtaining the liquor license, North was willing to listen to their proposal. CW1 provide Louie with an FBI code word and North's office telephone number. Louie was told that if he or his family were interested in talking to North about a bribe, they should call him and use the code word. After CW1 provided this information, Louie stated he was going to call his sister ANGELA Kamposh with the information and asked CW1 to do the same.

7.  ANGELA called North and left him a message on his voicemail using

2

the provided code word. North returned her telephone call and they agreed to meet on 06/26/2013.

8. North and ANGELA met at a local restaurant on 06/26/2013 and discussed North's his opposition to the issuing of a liquor license for the Kamposh's store. In North's official position as Deputy Chief of Public Safety in Berkley, North has decision making authority and influence about who should receive a liquor license in his jurisdiction. The meeting was consensually recorded by the North. During the meeting, ANGELA offered North $15,000 to assist her in obtaining a liquor license for her family's liquor store. ANGELA offered to pay North in installments and stated she will need 7-10 days to get the first installment payment of $10,000 to North.

9. On 07/10/2013, North and ANGELA met at a local restaurant. This meeting was consensually recorded by North. At the meeting, ANGELA discussed how she wanted North to actively use his law enforcement position help her family obtain the liquor license. ANGELA provided North with $5,000 cash during the meeting and told him she was not able to obtain the full amount of money she had promised him at the last meeting. ANGELA agreed to pay North a total of $30,000 for his help with the liquor license and staid she will provide more money to him at future meetings.

10. CW1 has known ANGELA for the past two years. During that time, ANGELA and her brother, Louie have discussed with CW1 restarting their illegal

narcotics distribution operation. They told CW1 they were going to use their past narcotics suppliers to get the drugs.

11. On 7/24/2013, North met with ANGELA at a local restaurant and recorded their conversation. During this meeting, ANGELA asked North to use his position as a police officer to assist her transporting marijuana. In coded language, ANGELA described how her marijuana supplier, whom she called "the landscaper", was going to supply her with marijuana, ("landscaping or bushes") and that the supplier was in another part of the country. North and ANGELA agreed that ANGELA would pay North a separate fee for protecting the narcotics shipment, apart from her payment to North for his assistance with the liquor license. ANGELA offered to split the net drug sale proceeds with the North if he successfully protected the drug shipment. I have reviewed the criminal history for ANGELA Kamposh, and it revealed that she was convicted in 2010 for felony distribution/manufacture of class 1 or 2 narcotics in Oakland County Circuit Court and received probation.

12. During the 07/24/2013 meeting, North told ANGELA he could research her narcotics supplier through law enforcement databases. North told her the purpose of this was to make sure her supplier was not the target of an investigation. ANGELA agreed to have North conduct the checks and provided her supplier's name as Hector Millan ("Millan").

13. On 08/29/2013, North conducted a consensual recording with

4

ANGELA at a 2160 Coolidge Highway, Berkley, MI, the site of ANGELA's future liquor store. During this meeting, ANGELA and North discussed her upcoming drug transaction with Millan. ANGELA provided North with approximately 1.5 grams of what appeared to be marijuana at the meeting. ANGELA wanted North to test the suspected marijuana to assure her that Millan was providing her with quality marijuana. Subsequently this material was tested at the Michigan State Police lab and it was found to be marijuana.

14. On 09/04/2013, North conducted a consensual recording with ANGELA Kamposh at a local restaurant. During this meeting, North and ANGELA discussed routes and vehicles they would use in to transport the narcotics. ANGELA told him the narcotics would be from Millan and would be sent to a buyer in the Upper Peninsula of Michigan. ANGELA anticipated several hundred pounds of marijuana would need to be transported, along with a large supply of illegally obtained prescription pills.

15. On 09/05/2013, ANGELA told CW1 that Millan was going to be providing her with cocaine to purchase. ANGELA told CW1 that Millan told her that he could provide her with 40 kilograms of cocaine.

16. 09/06/2013, ANGELA told CW1 that Millan was going to provide her with 20-40 kilograms of cocaine to sell. She said Millan was arranging for an unidentified third party to ship the cocaine to an undisclosed location in Southwest Detroit. When the cocaine arrived, she would either have to pick it up from the

5

storage location in Southwest Detroit or arrange for it to be delivered to her. She told CW1 that she planned on asking North to protect the shipment and storage of the cocaine.

17. On 09/06/2013, a consensually recorded conversation occurred between North and ANGELA at ANGELA's future liquor store at 2160 Coolidge Highway. ANGELA asked North to use his law enforcement position to protect a cocaine shipment of 20-40 kilograms of cocaine. She said she was getting the cocaine from Millan. ANGELA told North Millan would arrange for the cocaine be sent to an unknown location in Southwest Detroit. The cocaine would then have to be picked up or be delivered to ANGELA. She said she wanted North to provide protection for the cocaine. ANGELA discussed with North where to store the cocaine and she decided she would keep the drugs at the future liquor store.

18. On 09/06/2013, ANGELA told CW1 that during her meeting with North on 09/06/2013 he had agreed to protect her cocaine shipment from Millan. She further told CW1 that she had decided to store the cocaine at 2160 Coolidge Highway, Berkley, MI. The cocaine would be placed in sealable storage tubes.

19. On 09/08/2013, I, acting in an undercover capacity as a potential purchaser of illegal narcotics, conducted a consensual recording with CW1 and ANGELA by telephone. CW1 had helped establish with ANGELA that I was a drug trafficker in the Upper Peninsula of Michigan. During this conversation, ANGELA said she would be in possession of 20-40 kilograms of cocaine within

6

the next week and was interested in selling it to me. She also said she would have several hundred pounds of marijuana and several hundred thousand of dollars worth of prescription narcotics available to sell me within the next two weeks. ANGELA asked if I would be able to provide them with the cash, in excess of one million dollars, to purchase the cocaine, marijuana and prescription narcotics.

20. On 09/18/13, North met with ANGELA and recorded the conversation. ANGELA told North that Millan would be supplying her with approximately 100 kilograms of cocaine, several hundred pound of marijuana and a significant amount of prescription narcotics. She said the narcotics would be stored in a storage facility in Southwest Detroit and transported to her store in Berkley, MI.

21. CW1 told me he spoke with ANGELA on September 21, 2013, and ANGELA said she spoke with Millan regarding the cocaine shipment. Millan told ANGELA that the 100 kilograms of cocaine was loaded onto a truck in San Diego, CA on September 19, 2013, and that the truck was transporting the cocaine to Chicago, arriving approximately September 23, 2013. According to ANGELA, Millan told her that as soon as he confirms the cocaine is in Chicago, he will fly to Detroit, MI. ANGELA told CW1 that Millan will be making the delivery of the cocaine to her facility in Berkley, MI.

22. On 10/12/2013, while at the Subject Premises, ANGELA showed CW1 a plastic bag that contained more than 1,000 illegally obtained prescription

7

pills that she wanted CW1 to deliver to her buyer in the Upper Peninsula of Michigan. Located inside the larger bag were smaller plastic bags which contained prescription narcotics broken down by the type of pills. The smaller bags were labeled by hand and contained the type and amount of pills. These labels included Vicodin, Percocet, Oxycontin, Xanax, Diludid, Valium, Norco, Soma, Nuvigil, Focalin, Concerta, and Roxicodone. ANGELA told CW1 she wanted him/her to deliver the pills to her buyer in the Upper Peninsula as soon as possible.

23. CW1 told me that on 10/13/2013, Hadeer Siba ("Siba") came to ANGELA's home (the Subject Premises) and picked up a clear plastic bag containing pills from ANGELA labeled "100 Vicodin." CW1 saw Siba provide ANGELA with an unknown amount of cash and then leave the Subject Premises. CW1 told me that ANGELA took the Vicodin from the bag of prescription narcotics pills she told CW1 to deliver her buyer. CW1 said ANGELA assured him she would replace the pills prior to the delivery and promised to acquire more prescription narcotics.

24. On October 15, 2013, a federal search warrant was executed at the residence of ANGELA KAMPOSH. Over 2,000 pills that are scheduled controlled substances and which were illegally obtained prescription medications were seized at ANGELA's home during the search. These included Vicodin, Percocet, Oxycontin, Xanax, Diludid, Valium, Norco, Soma, Nuvigil, Focalin,

Concerta, and Roxicodone.

25. On October 24, 2013, FAYE met with North at the Berkley Police Department and produced a color photograph of CW1 and said something to the effect of "this has to be ended." North told me he understood that to mean that FAYE wanted CW1 killed.

26. Later in the day on October 24, 2013, North met with ANGELA, FAYE and Stacey Kamposh at the Berkley Police Department. FAYE handed North an envelope containing $1,000 in $100 bills. North asked if this money was for his help in obtaining the Kamposh's liquor license and FAYE said "yes."

27. Later on October 24, 2013, officers arrested ANGELA KAMPOSH at the Berkley Police Department.

28. Based on the foregoing, there is probable cause that ANGELA KAMPOSH and FAYE KAMPOSH committed the offense of bribery, in violation of 18 U.S.C. § 666(a)(2), and ANGELA KAMPOSH committed the offense of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1).

_____
DAVID S. KOTAL
SPECIAL AGENT, FBI

Subscribed and sworn to before me
this 25th day of October, 2013.
_____
HONORABLE R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

9